**Electronically Filed
Supreme Court
SCWC-14-0000355
28-AUG-2017
08:22 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I, Respondent/Plaintiff-Appellee

vs.

WILLIAM MCDONNELL, Petitioner/Defendant-Appellant

SCWC-14-0000355

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-14-0000355; FC-CR. NO. 13-1-0002)

AUGUST 28, 2017

RECKTENWALD, C.J., NAKAYAMA, AND McKENNA, JJ.,
WITH POLLACK, J., DISSENTING, WITH WHOM WILSON, J., JOINS

OPINION OF THE COURT BY RECKTENWALD, C.J.

William McDonnell was found guilty of sexually assaulting his minor daughter (Minor) in November 2013. On appeal to the Intermediate Court of Appeals (ICA), McDonnell argued that the family court improperly admitted the testimony of the State's expert witness, Dr. Alexander Bivens. Dr. Bivens

testified with regard to the dynamics of child sexual abuse, including delayed reporting and underreporting by victims of abuse, and "grooming" techniques typically used by abusers. Bivens' testimony included statistics regarding how often abuse occurs in the child's home, and how frequently it involves individuals who are known to the child. McDonnell argued that Dr. Bivens' testimony was irrelevant, was unduly prejudicial, and improperly profiled McDonnell as a child molester. The ICA affirmed McDonnell's conviction, and he now seeks review in this court.

This case requires us to consider how expert testimony can properly assist a jury in understanding the relationship between victims of child sexual abuse and their abusers. As we explained in State v. Batangan, 71 Haw. 552, 556, 799 P.2d 48, 51 (1990), "sexual abuse of children is a particularly mysterious phenomenon, and the common experience of the jury may represent a less than adequate foundation for assessing the credibility of a young child who complains of sexual abuse[.]"

We conclude that the family court did not abuse its discretion in admitting most of Dr. Bivens' testimony since the testimony helped explain the interaction between Minor and McDonnell, and its probative value outweighed its prejudicial effect. While we further conclude that the statistical evidence should not have been admitted, that error was harmless beyond a reasonable doubt.

Accordingly, we affirm the ICA's judgment on appeal.

## I.  Background

McDonnell was charged with three counts of sexual assault in the first degree[1] (Counts I, II, and III) and three counts of sexual assault in the third degree[2] (Count IV, V, and VI) in the Family Court of the First Circuit[3] for six separate acts that occurred on or about November 1, 2012.

## A.  Trial Proceedings

### 1.  Motions in Limine

McDonnell filed a motion in limine asking the family

---

[1]   Hawaiʻi Revised Statutes (HRS) § 707-730(1)(b) (Supp. 2009) provides:

> (1) A person commits the offense of sexual assault in the first degree if:
> . . . .
> (b) The person knowingly engages in sexual penetration with another person who is less than fourteen years old[.]

[2]   HRS § 707-732(1) (Supp. 2009) provides:

> (1) A person commits the offense of sexual assault in the third degree if:
>       (a) The person recklessly subjects another person to an act of sexual penetration by compulsion;
>       (b) The person knowingly subjects to sexual contact another person who is less than fourteen years old or causes such a person to have sexual contact with the person;
>       (c) The person knowingly engages in sexual contact with a person who is at least fourteen years old but less than sixteen years old or causes the minor to have sexual contact with the person; provided that:
>             (i) The person is not less than five years older than the minor; and
>             (ii) The person is not legally married to the minor[.]

[3]   The Honorable Randal K.O. Lee presided.

3

court to exclude Dr. Bivens' testimony as irrelevant and overly prejudicial.  In response, the State filed a motion in limine asking the court to admit Dr. Bivens "as an expert witness on the dynamics of child sexual assault."

McDonnell filed a second motion in limine asking that the court exclude evidence regarding the "general area of the dynamics of child sexual assault" as "irrelevant, confusing or misleading" under HRE Rules 401[4] and 403.[5]  He noted that Dr. Bivens planned to testify to "actions said to be commonly performed by the so-called typical sexual abuser and the typical characteristics of a sexual abuser, i.e., 'profile evidence,' as exhibited in the 'abuse process' and 'grooming process.'"  He argued that such expert testimony was not relevant, had the potential to bolster Minor's credibility, and risked profiling him as a sex offender.

The family court held a hearing on the parties' motions in limine.  In response to defense counsel's arguments that Dr. Bivens' proposed testimony was based on "statistics for studies

---

[4]     HRE Rule 401 defined "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

[5]     HRE Rule 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

which the defendant's not a part of and has [*sic*] nothing to do with this case," the family court stated:

> Well, isn't it the jurors['] credibility to determine credibility?  Because the jurors going to be instructed that the expert testimony can be disbelieved by them, okay.  And doesn't that goes [*sic*] to credibility of the witness, such as like, for example, your client is saying, well, you know, this person has a motive to accuse me of these crimes and, therefore, you want all these letters and e-mails come in, wouldn't Dr. Bivens be the same?  His credibility is on trial.

The family court ruled that Dr. Bivens would be allowed to testify because testimony on the "phenomena of child abuse" is relevant under Batangan.  The court noted that, if Dr. Bivens testified to statistics, the defense could "challenge him on those studies."

### 2.    Trial Testimony: Minor and Mother

At trial, the State presented Minor and McDonnell's wife, Minor's mother (Mother), among other witnesses.  Minor was thirteen years old at the time of trial.

Mother testified that she and Minor typically slept in a separate bedroom than McDonnell.  She testified that Minor fell asleep in McDonnell's bedroom on November 19, 2012, and that McDonnell said not to wake her.

Minor testified that, while she slept in McDonnell's bed that night, she woke up around 2:00 a.m. because she felt a hand on her thigh.  Minor testified that McDonnell moved his hand into her underwear, rubbed her vagina, and inserted a finger into

5

it.  Minor testified that she "sat there dumbstruck" and "wanted it to stop."  She testified that she turned her back to McDonnell, but he did not stop, so she left the room.

Minor testified that she went into the bedroom where Mother was sleeping, but did not wake Mother up because she had to work in the morning.  Minor testified that, when she woke the next morning, Mother had already left for work.  Minor testified that, later that day, she told Mother that McDonnell "had touched [her] that night."[6]

Mother testified that she then talked to McDonnell about what Minor told her.  Mother told McDonnell "don't do that again because it's a crime," and then told him to "apologize to [Minor]."  She testified that McDonnell responded "yes."  When Mother asked McDonnell why he did it, he replied, "I don't know," and added, "I'm so sorry."  After that night, they did not talk any more about the incident, and nobody called the police.

Minor testified to several other incidents where McDonnell touched her in a sexual way.  For example, during one incident she "was sitting on his computer ordering this game and then he kind of came up behind me and he kind of like groped my boobs."  Minor also testified that McDonnell gave her a "sexual hug" where he "put his hands like down my pants and . . .

---

[6]     Minor also testified that she wrote a note that day stating that her father had touched her inappropriately and that she left the note in the glove compartment of McDonnell's car.  After Minor reported the abuse in January 2013, police searched the car but did not find the note.  Minor testified that she found the note and gave it to Mother in March 2013.

touch[ed] my butt." In another incident, Minor testified that she asked for a foot massage, and McDonnell moved his hands up her leg and inserted his finger into her vagina. Another time, she asked for a back massage, and McDonnell "massage[d] my butt and then . . . put his finger inside my butt hole." Minor also testified to an incident where McDonnell took pictures of her while she was undressed and "after taking the pictures he like put his mouth on my vagina and started like kissing it and sucking on it." Minor explained that she did not report the abuse to Mother at that time because "I didn't want to see my mom sad."

Minor also discussed a pattern of trading sexual contact for things that she wanted. She testified that McDonnell "came up with the term 'benefits' to get stuff I wanted." She explained that "benefits" meant that "I would willingly let him touch me to get what I wanted" and that "I wouldn't tell anybody[.]" She would generate a "wish list" of expensive items, and when she asked McDonnell to buy them, "[h]e would kind of pull out the term 'benefits.'"

Minor testified that the last time McDonnell touched her was on a Saturday or Sunday. According to Minor, McDonnell put his hands down her pants, "touched my butt and kind of like massage[d] it," and then "tr[ied] to touch my vagina." When McDonnell wanted to touch her the next day, Minor testified that she was "fed up" and "wouldn't do it," and that he said "you know

7

one day I'll screw you." Minor became "really mad" and responded "one day I'll kill you for all the pain you caused me." She then "slammed the door in his face" and left.

The following Monday, on January 14, 2013, Minor went to school and told her school counselor about the incidents with McDonnell. Minor's school then notified the police.

On cross-examination, Minor admitted that after McDonnell was arrested, she "hacked" his computer and made purchases using his Amazon account. Minor also admitted that she told the police detective that she did not look at pornography, and that she was lying when she told the officer that.

### 3.    Trial Testimony: Dr. Wayne Lee

The State also presented Dr. Wayne Lee, an expert regarding the "examination of individuals for alleged sexual assault[.]" Dr. Lee testified that he examined Minor on January 14, 2013, and that Minor described "an incident that occurred 48 hours previous to [the] exam between her and [McDonnell]." Dr. Lee testified that he followed "a check off list asking specific questions relative to a sexual assault." He asked Minor whether her genitals were penetrated, and Minor stated that her vagina was penetrated by McDonnell's fingers.

Dr. Lee also testified to other questions on his list:

> [Dr. Lee]:  The other check marks that she answered in affirmative was whether or not William McDonnell had fondled her. And she said he touched my butt, I said stop. And also with regard to masturbation, I asked her if he had tried to put his hand on her genital

8

area.  And her response was yes.  And that I asked . .
. what she meant by that.  She said he was massaging
it, meaning her genital area.

[State]:  And did she say anything with regard to
touching or penetration of her anus?

[Dr. Lee]:  When I asked about the penetration of her
anus she indicated no.

Dr. Lee testified that Minor told him that the abuse had occurred "more than 20 times" since September 2012.

Dr. Lee testified that after going through the questions, he asked Minor "if there was anything else you want to add."  Minor then answered that McDonnell "inserted his finger in my asshole twice" since September 2012.  During the physical examination, Dr. Lee did not see any injuries or detect any physical abnormalities, but opined that fewer than half of patients "that present like Minor did" would have injuries at the time of examination.

### 4.    Trial Testimony: Dr. Bivens

The State called Dr. Bivens, who first testified as to his qualifications.  These qualifications included a Ph.D. in clinical psychology,[7] a postdoctoral fellowship in Kauaʻi "in a

---

[7]     Dr. Bivens testified that his dissertation:

compared a group of convicted child molesters to a
group of men who were matched for the same age and
same ethnicity and same general background but were
not child molesters, and then we administered test
data to distinguish some of the traits that child
molesters have that normal men don't have.

Dr. Bivens did not reference or rely on this dissertation in his subsequent testimony.

program that serves underserved youth in the community," and experience in private practice, where he treated "maybe 700 or 800" adolescent patients.  Defense counsel reasserted his objection to Dr. Bivens' testimony, and the family court overruled the objection, reasoning:

> In following Batangan and State versus Silva . . . the expert testimony in Silva explained the girl's, perhaps, bizarre behavior like going back into the room.  I don't know.  So, over your objection, there is some relevance in some expert testimony to assist the jurors with scientific and complex type of issue.

The court thus qualified Dr. Bivens as an expert in "clinical psychology with a subspecialty in child sexual abuse."

Dr. Bivens testified that he uses the term "molestation" interchangeably with the term "sexual abuse."  When asked if molestation usually involves physical force, he responded, "Well, usually not, and so probably 80 percent of the time there's not any real physical force involved."  Based on the research and literature on the relationship between victims of child sexual abuse and molesters, Dr. Bivens testified that "85 percent of the time, . . . the child has a pre-existing nonsexual relationship with [his or her] molester."

Dr. Bivens stated that "there's a documented phenomenon called incest when the molester is living in the child's own home is somehow affiliated with the family, whether they're a direct blood member or stepparent or an uncle that's living in the home."  When asked whether "the research say[s] where child

10

sexual abuse usually occurs[,]" Dr. Bivens responded:

> A. Yes, it does.  And so there are two studies that I usually rely on, large numbers of -- you know, so large number meaning more than 100 molesters talking about where they commit their crimes.  So 100 percent of incest offenders report molesting in their own home, and even non-incest offenders will molest in the child's own home.  So it's usually in the child's home or the molester's home. . . .

Dr. Bivens testified that "the most typical thing for a child to do when [he or she has] been molested is not tell anybody for a long time."  Dr. Bivens testified about studies in which a majority of abused children delayed disclosing their abuse for over one month.  He also testified about a study in which children did not disclose that their genitalia had been touched by a doctor, noting that there is "some natural tendency that children [would] not . . . want to talk about that type of touching."  Dr. Bivens also explained a study on over two hundred incest survivors that indicated that "they were being subjected to sexual relations to a relative, [but that] they let it go on without telling anybody for a significantly long period of time."

Dr. Bivens described studies identifying the reasons for nondisclosure by child victims of sexual assault.  One study found that victims expected themselves to be blamed and therefore "were embarrassed, . . . didn't want to upset anybody, and . . . expected not to be believed."  Another study found that victims felt scared, did not want to get in trouble, felt that no one would believe them, embarrassed, and did not want to get anybody

else into trouble.

Dr. Bivens testified that two studies demonstrate that a sexually abused child will most likely report the abuse to mothers and close friends. Regarding what triggers a child to finally disclose the sexual abuse, one study identified "an anger inducing event where the child feels that [he or she is] being subjected to still more unfairness perhaps at the hands of [his or her] perpetrator or someone related to [him or her]." Dr. Bivens described another trigger is "the proximity of the offender," e.g., "if the offender leaves the child's sphere they may feel more safe, better able to disclose."

Dr. Bivens was then asked to discuss the "abuse process," and he explained that there are four primary methods in which molestation is committed: "[s]educing and testing, masking sex as a game, emotional and verbal coercion, and taking advantage of a child in a vulnerable position."

According to Dr. Bivens, "[s]educing and testing refers to how a molester will establish a healthy touching relationship with a child in advance of any sexual contact." The molester then slowly incorporates sexual touching into the healthy touching relationship. The molester "tests" the child by "monitoring the child's responses for any type of startle or any type of upset."

Dr. Bivens testified that masking sex as a game is similar to seducing and testing; the only difference is that it

12

starts with "a playful touch relationship," such as "tickling, wrestling, carrying around, [and] swinging around."  Thereafter, the child molester slowly incorporates sexual touching into the playful touch relationship.

Dr. Bivens described emotion and verbal coercion as often involving a "sort of bargaining or bribing -- if you give me this, I'll give you that."  Dr. Bivens gave examples, like "giving gifts or giving treats," "withholding punishments[,]" or guilt tripping in order to emotionally and coercively obtain sex from the child.

Lastly, Bivens discussed "taking advantage of a child in a vulnerable position" as most often referring "to approaching a sleeping child."  In those instances, most of the children are in fact awake, "but . . . were playing possum because they didn't know what to do, and the sex offense continues in that fashion."

As to the completeness of the initial disclosures of sexually abused children, Dr. Bivens identified a study involving college students who had reported being molested as children:

> [The college students] were simply asked:  What was your initial disclosure like when you first told somebody?  How much of what happened did you tell?  And about 75 percent said that they just gave some very vague, you know, general descriptions of what had happened -- some touching that was inappropriate, when in fact it may have been much more elaborate than that.

Another study compared the disclosures made by sexually abused children and the sexual abuse documented on confiscated

video tapes.  Dr. Bivens testified:

> The researchers compared what the children said
> happened to them with what was actually captured on
> the videotape.  And what they found was that the
> children, in those three days, reported roughly half
> of the number of incidents and also half the severity
> of incidents that was actually represented on the
> videotapes. . . .  And so what they found is that, you
> know, kids who had been penetrated were not talking
> about being penetrated.  Kids who had been forced to
> perform oral sex were not disclosing certain of those
> kinds of details.  And so what we know now in that
> same study some additional researchers came in, and
> eventually many of the kids were able to get to the
> point where they could disclose, but it took much more
> than the initial three days.

Defense counsel moved to strike this testimony on incomplete disclosures, arguing that it was "extremely prejudicial" by "inviting the jury to speculate" that McDonnell did something more severe than what Minor already disclosed.  The court asked whether this testimony would explain to the jury why Minor did not disclose all of the alleged instances of abuse to Dr. Lee.  Defense counsel responded that the testimony may be probative in that respect, but was more prejudicial for insinuating "the rule not the exception" is that more abuse occurs than what is disclosed.  The court overruled the objection, reasoning that Dr. Bivens said "it could be 50 percent accurate, 50 percent not accurate," which is not "an overwhelming percentage."

Dr. Bivens further testified that episodes of child sexual abuse "tend to be a more memorable event itself" and opined that there is "reason to believe that the memories of the

14

event itself tend to be good."  However, "the nature of those memories are consistent with other forms of traumatic memory such that the event itself loomed so large that peripheral details tend to blur."  Hence, there is "tunnel memory" with respect to recollection of child sexual abuse, "where the event itself is recalled well, but . . . the clothes that [the child was] wearing, maybe the time of day or . . . certain things get to be blurred in the way the memory is reported on by the child."

When asked whether there is a profile to a typical child molester, Dr. Bivens answered that "there is not" and that it is not possible to look at "demographic characteristics" or "personality characteristics" to determine whether someone is a child molester.  Dr. Bivens stated that "[c]hild molesters are defined by the child molestation behavior itself, not by any sort of profiling evidence or anything like that."  Dr. Bivens also indicated that he was not familiar with any of the facts of the case and that he had not spoken with any of the witnesses.

During cross-examination, Dr. Bivens acknowledged that the statistics he cited during his testimony were derived from studies that did not use the same analytical framework or procedure.  Dr. Bivens also testified that the studies may have had different criteria for determining which children were actually molested, and some studies would not validate whether the child's report of sexual abuse was actually true.

15

## 5.    Closing Arguments, Verdict, and Sentencing

Following the State's case,[8] the defense rested without presenting any evidence.  In its closing, the State argued that Minor's and Mother's testimony demonstrated that McDonnell knowingly engaged in sexual penetration and sexual conduct with Minor.  The State recounted Minor's testimony regarding the abuse and argued that Mother's testimony corroborates Minor's testimony.  The State cited Dr. Bivens' testimony to explain why Minor delayed disclosing the abuse to her school counselor.  The State noted that Dr. Bivens spoke about "triggers" such as an anger-inducing event and that Minor and McDonnell had gotten into an argument before she disclosed to her school counselor.

The State also cited to Dr. Bivens' testimony about the abuse process, specifically "the emotional and verbal coercion." The State argued that McDonnell conditioned Minor into a "'this for that' type of relationship" and "manipulate[d] her to let him do what he wanted" by giving her things.  The State stated that "Dr. Bivens talked about that."

Defense counsel argued that the evidence presented by the State was insufficient to sustain the charges of sexual

---

[8]    The State also presented the following witnesses:  two Honolulu Police Department (HPD) evidence specialists who examined the evidence obtained from McDonnell's apartment, the director of human resources at McDonnell's workplace who testified to McDonnell's typical work schedule, Minor's counselor to whom she reported the abuse, two HPD officers who investigated Minor's case, and who searched McDonnell's car but did not recover the note Minor said she wrote on November 20, 2012, and an HPD forensic examiner who examined McDonnell's computer and camera but did not find any pornography or nude photographs of Minor.

assault. Defense counsel argued that "the evidence begins and ends" with Minor and that "her credibility, how much you believe her, is everything in this case." Defense counsel stated that "[w]e would all like to believe that a child wouldn't lie, that a child wouldn't make up this kind of thing, let alone your child[,]" but that "[w]e know sometimes kids lie." Defense counsel noted that "Dr. Bivens even acknowledged . . . that sometimes there may be people in the studies of kids who make false allegations."

Defense counsel argued that Minor's story "doesn't make any sense with the physical evidence." Defense counsel argued that Minor's testimony had several inconsistencies and noted that Minor lied about watching pornography and hacked McDonnell's computer after he was arrested to "go on a shopping spree[.]"

Defense counsel argued that Minor's testimony was not consistent with Dr. Bivens' testimony "about testing and nonsexual touch" because Minor had asked for massages from McDonnell. Defense counsel also emphasized that Dr. Bivens "knows nothing about the case," has "no publications in the area," and discussed studies using "some flaws and inconsistent methods." Defense counsel argued that Mother is "just dead set on backing up [Minor's] story out of her . . . feeling of loyalty and love for her."

In rebuttal, the State argued that Minor's inability to recall certain details did not indicate that Minor was lying.

17

The State noted that "Dr. Bivens told you children remember the main facts, the main stuff that happens when they're molested[,]" but might not remember "what they were wearing" or "an exact date[.]"

The jury found McDonnell guilty as charged in Count I of sexual assault in the first degree and counts IV-VI of sexual assault in the third degree.[9]  The family court sentenced McDonnell to a term of imprisonment of twenty years.

**B.   Appeal to the ICA**

On appeal, McDonnell argued, among other things, that the family court erred in allowing Dr. Bivens to testify because his testimony was inadmissible under HRE Rules 401, 403, and 702.

The ICA held that Dr. Bivens' testimony was properly admitted, dividing the testimony into three categories.  First, the ICA found that the court did not err in allowing Dr. Bivens' testimony about delayed reporting and tunnel memory by child victims.  The ICA found that Minor reported two of the alleged incidents soon after they occurred, but also testified to other incidents that were not immediately reported.  The ICA noted that Dr. Bivens' description of tunnel memory gave the jury context in which to evaluate Minor's giving of "different accounts as to the date of the initial abuse."

Second, the ICA found that the family court did not err

---

[9]     The jury found McDonnell not guilty of Counts II and III of sexual assault in the first degree.

18

in admitting Dr. Bivens' testimony regarding incomplete reporting.  The ICA reasoned that the testimony was helpful in understanding "not only [Minor's] silence after first disclosing to her mother, but also why she may not have described any details of the abuse initially."

Third, the ICA determined that Dr. Bivens' testimony regarding the abuse process did not constitute improper profile evidence.  The ICA stated that the testimony was "relevant to explain that a child may delay reporting because the molester has normalized the abuse."  The ICA found that Dr. Bivens did not profile McDonnell as a sex offender, noting that Dr. Bivens "told the jury he did not know the facts of the case" and made clear that there is no profile for "a typical child molester."

Because the ICA found Dr. Bivens' testimony to be admissible, the ICA affirmed the family court's judgment as to Count I.[10]

In his concurring and dissenting opinion, Judge Reifurth agreed with regard to the testimony on incomplete disclosures and delayed reporting.  He dissented with respect to the "abuse process" testimony because its probative value was outweighed by its potential prejudicial effect.  He warned that "courts must be particularly careful to consider the degree to

_____

[10]     The ICA vacated the convictions on Counts IV-VI and remanded those counts for dismissal without prejudice, finding that the State failed to allege an attendant circumstance that was an element of the offenses charged in the counts.

which common characteristic testimony of this sort undermines the foundational principles of our criminal justice system." He concluded that the family court's error in admitting the testimony was not harmless because the evidence against McDonnell was not overwhelming.

## II.  Standard of Review

## A.  Admission of Opinion Evidence (Expert Testimony)

"Generally, the decision whether to admit expert testimony rests in the discretion of the trial court.  To the extent that the trial court's decision is dependant upon interpretation of court rule[s], such interpretation is a question of law, which [the appellate] court reviews de novo." Barcai v. Betwee, 98 Hawai'i 470, 479, 50 P.3d 946, 955 (2002) (citations omitted).

## III.  Discussion

On certiorari, McDonnell presents the following question:

> Whether the ICA gravely erred in holding that the Family Court did not err in allowing the testimony of Dr. Alexander Bivens, the State's expert on the dynamics of child sexual abuse.

McDonnell makes three arguments challenging the introduction of Dr. Bivens' testimony.  First, he argues that the ICA gravely erred because Dr. Bivens' testimony on delayed reporting, tunnel memory, incomplete disclosure, and the abuse process was irrelevant.  Second, he contends that the probative value of the

20

testimony on incomplete disclosure was substantially outweighed by the danger of unfair prejudice.  Lastly, he asserts that Dr. Bivens' testimony on the abuse process and use of statistics constituted improper profile evidence and created a danger of unfair prejudice.

We conclude the ICA correctly held that the family court did not abuse its discretion in admitting the testimony of Dr. Bivens, with the exception of portions of the statistical evidence.  However, the admission of that evidence was harmless beyond a reasonable doubt.

## A.  The Circuit Court Exercised its Discretion in Admitting Dr. Bivens' Testimony.

As a threshold matter, we note that the circuit court clearly exercised its discretion in admitting Dr. Bivens' testimony.  The Dissent disagrees, citing State v. Hern's observation that "[t]he existence of discretion requires its exercise[,] and a court fails to properly exercise its discretion when it bases a decision on categorical rules and not on the individual case before it."  133 Hawaiʻi 59, 65, 323 P.3d 1241, 1247 (App. 2013).  Dissent at 9.  Hern was a consolidated appeal in which two defendants challenged the dismissal of criminal charges without prejudice.  Id. at 60, 323 P.3d at 1242.  For the first defendant, the trial court stated that its dismissal was "based on its 'typical practice on [HRPP] Rule 48.'"  Id. at 65, 323 P.3d at 1242.  For the second defendant, the trial court did

21

not state a reason for its dismissal without prejudice.  Id. at 62, 323 P.3d at 1244.  The ICA vacated the trial court's judgments:  Regarding the first defendant, the ICA concluded that the trial court applied a blanket rule where it should have exercised its discretion; regarding the second defendant, the ICA concluded that the record was inadequate to meaningfully review whether the trial court exercised its discretion, as transcripts from relevant hearings were missing from the record on appeal. Id.  The instant case is thus distinguishable from Hern, as the circuit court did not rely on a blanket policy in allowing Dr. Bivens' testimony, and the record on appeal is adequate for this court to review its decision.[11]

The Dissent asserts that in the present case the circuit court "based its determination on a categorical rule that Batangan deemed such evidence to be somewhat relevant and thus admissible."  Dissent at 11.  This characterization is not supported by the transcript of the circuit court's ruling on this issue, which states:  "In following Batangan and State versus Silva . . . the expert testimony in Silva explained the girl's,

_____

[11]     The Dissent's citation to State v. Martin, 56 Haw. 292, 535 P.2d 127, is also inapposite.  Dissent at 9.  In Martin, the trial court "summarily rejected" a criminal defendant's motion to defer acceptance of his guilty plea, with the judge "emphasizing, as he had in the past, that he did not and would not under any circumstances consider any motion for deferred acceptance of a guilty plea."  Id. at 293, 535 P.2d at 127.  This court reversed the trial court, holding that "[d]iscretionary action must be exercised on a case-by-case basis, not by any inflexible blanket policy of denial."  Id. at 294, 535 P.2d at 128.  In the instant case, the circuit court clearly considered the arguments for and against allowing Dr. Bivens' testimony, and it cannot be said that its ruling was based on an "inflexible blanket policy."

perhaps, bizarre behavior like going back into the room. . . . So, over your objection, there is some relevance in some expert testimony to assist the jurors with scientific and complex type of issue." An oral ruling such as this can support multiple interpretations upon close reading, but the fact that the court referenced Batangan does not mean that it abdicated its discretion. Rather, it merely indicates that the court considered relevant precedent when it determined that Dr. Bivens' testimony was admissible.

**B. Dr. Bivens' Testimony Regarding Child Victims of Assault was Relevant Under HRE Rule 702.**

McDonnell argues that delayed reporting, tunnel memory, and incomplete disclosure "played no significant role in this case," and thus Dr. Bivens' testimony was irrelevant. He also argues that testimony regarding the abuse process and the accompanying statistics "were completely irrelevant to explaining any behavior on the part of Minor." McDonnell further asserts that Dr. Bivens' testimony "did almost nothing to assist the jury in ascertaining truth in relevant areas outside the ken of ordinary laity" because the record does not indicate that "[Minor's] behavior was, to average people, superficially inconsistent with the occurrence of sexual abuse or uniquely attributable to child sexual abuse rather than general stress or trauma."

The admission of expert testimony is governed by HRE

23

Rule 702, which states:

> If scientific, technical, or specialized knowledge
> will assist the trier of fact to understand the
> evidence or to determine a fact in issue, a witness
> qualified as an expert by knowledge, skill,
> experience, training, or education may testify thereto
> in the form of an opinion or otherwise.  In
> determining the issue of assistance to the trier of
> fact, the court may consider the trustworthiness and
> validity of the scientific technique or mode of
> analysis employed by the proffered expert.

One of the "touchstones of admissibility or expert
testimony under HRE 702" is relevance.  State v. Vliet, 95
Hawai'i 94, 106, 19 P.3d 42, 54 (2001).  "In determining the
relevancy issue, the trial courts' function is akin to the
relevancy analysis adopted in applying HRE Rules 401 (1993)[12]
and 402 (1993)[13]."  Id.  Expert testimony must assist the trier
of fact by providing "a resource for ascertaining truth in
relevant areas outside the ken of ordinary laity," and should
include "knowledge not possessed by the average trier of fact who
lacks the expert's skill, experience, training, or education."
Batangan, 71 Haw. at 556, 799 P.2d at 51.  A trial court's
relevancy determination is reviewed under the right/wrong

---

[12]     HRE Rule 401 defines "relevant evidence" as "evidence having any
tendency to make the existence of any fact that is of consequence to the
determination of the action more probable or less probable than it would be
without the evidence."

[13]     HRE Rule 402 provides:

> All relevant evidence is admissible, except as
> otherwise provided by the Constitutions of the United
> States and the State of Hawai'i, by statute, by these
> rules, or by other rules adopted by the supreme court.
> Evidence which is not relevant is not admissible.

standard.  State v. Pulse, 83 Hawai'i 229, 247, 925 P.2d 797, 815 (1996).

In Batangan, this court addressed HRE Rule 702 in the context of expert testimony in child sexual abuse cases.  71 Haw. at 556, 799 P.2d at 51.  The defendant in Batangan was accused of having sexual contact with his daughter, who did not report the incidents until several months after they occurred and then later recanted her allegations.  Id. at 554, 799 P.2d at 50.  Dr. John Bond, an expert in clinical psychology and child sexual abuse, evaluated the daughter and testified for the prosecution at trial.  Id. at 554-55, 799 P.2d at 50.  This court held that Dr. Bond's testimony was inadmissible because it improperly vouched for the victim's credibility, reasoning that "experts may not give opinions which in effect usurp the basic function of the jury."  Id. at 562, 799 P.2d at 54.

However, the Batangan court also recognized that "sexual abuse of children is a particularly mysterious phenomenon, and the common experience of the jury may represent a less than adequate foundation for assessing the credibility of a young child who complains of sexual abuse[.]"  Id. at 557, 799 P.2d at 51 (internal quotation marks and citations omitted). Child victims can exhibit behavior "seemingly inconsistent with behavioral norms of other victims of assault[,]" such as delayed reporting and recantation of abuse allegations, which would normally "be attributed to inaccuracy or prevarication."  Id. at

25

557, 799 P.2d at 51. "In these situations it is helpful for the jury to know that many child victims of sexual abuse behave in the same manner." Id. 557, 799 P.2d at 52. Expert testimony, therefore, can explain to the jury "the unique interpersonal dynamics involved in prosecutions for intrafamily child sexual abuse" and correct "widely held misconceptions . . . so that [the jury] may evaluate the evidence free of the constraints of popular myths." Id. at 557-58, 799 P.2d at 52 (internal quotation marks and citations omitted; ellipses in original).

Thus, the Batangan court concluded that expert testimony explaining "seemingly bizarre behavior of child sex abuse victims is helpful to the jury and should be admitted," but "conclusory opinions that abuse did occur and that the child victim's report of abuse is truthful and believable" are not admissible. Id. at 558, 799 P.2d at 52 (internal quotation marks omitted).

We conclude that Dr. Bivens' testimony regarding delayed reporting, tunnel memory, and incomplete disclosure was relevant under Batangan because it assisted the jury in understanding the "seemingly bizarre behavior" exhibited by Minor and did not vouch for Minor's credibility.

With regard to delayed reporting, Dr. Bivens explained the reasons why victims may not disclose sexual abuse. He also testified to triggers that may cause victims to finally disclose the abuse, such as "an anger inducing event" involving the

26

abuser.  In this case, Minor disclosed the first incident of sexual abuse to Mother the next day, and she disclosed the final incident to a school counselor within approximately forty-eight hours.  However, there was a period of approximately two months, from November 2012 to January 2013, where Minor testified to multiple incidents of abuse that went unreported until January 2013.  Morever, Minor testified that she became very angry with McDonnell prior to disclosing the abuse to her school counselor.  Dr. Bivens' testimony regarding delayed reporting may have assisted the jury in understanding why Minor would not have reported the abuse right away and what ultimately caused her to report the abuse in January 2013.  Indeed, Batangan explicitly stated that "delayed reporting of the offenses" is the type of behavior that could be misconstrued by a jury.  71 Haw. at 557, 799 P.2d at 51.

      With respect to "tunnel memory," Dr. Bivens testified that a child may recall sexual abuse so that "the event itself is recalled well, but . . . maybe the time of day or . . . certain things get to be blurred."  This testimony was relevant because Minor gave different accounts as to the date of the initial abuse.  She testified at trial that the first instance of abuse was in November 2012, but had told Dr. Lee that the abuse started in September 2012.  Dr. Bivens' testimony regarding tunnel memory would therefore assist the jury in evaluating Minor's inconsistent recollection of the dates.

27

McDonnell argues that the tunnel memory testimony did not assist the jury in understanding Minor's behavior because Dr. Bivens testified that the tunnel memory of child victims "was not significantly different from any memory related to stress or trauma in general." This argument misstates Dr. Bivens' testimony. Dr. Bivens compared tunnel memory in child victims to "traumatic memories where a police officer has to use his weapon or traumatic memories that happen with war veterans." These are examples of extreme trauma, not "stress or trauma in general" as McDonnell asserts. The type of stress exhibited in these scenarios is not experienced by ordinary individuals and therefore would fall "outside the ken of ordinary laity." Batangan, 71 Haw. at 556, 799 P.2d at 51.

With regard to incomplete disclosure, Dr. Bivens testified that sexually abused children may not provide details regarding the full extent of their abuse. Minor testified that McDonnell inserted his finger into her vagina during the first instance of abuse, but that she only told Mother that McDonnell had "touched" her. Further, Dr. Lee testified that when he initially asked Minor whether McDonnell had penetrated her anus, she said no. However, at the end of their interview, Minor told Dr. Lee that McDonnell inserted his finger into her anus twice. There were also various types of abuse that Minor alleged at trial, but that she never reported to Dr. Lee. These include Minor's trial testimony that McDonnell "put his mouth on

28

[Minor's] vagina and started like kissing it and sucking on it," and that, on another occasion, McDonnell "massaged" her breasts. Therefore, Dr. Bivens' testimony regarding the behavior of child sex abuse victims would assist the jury in understanding why Minor did not initially disclose the full extent of the abuse.

Lastly, Dr. Bivens discussed the abuse process and the ways in which children can be coerced into submitting to sexual abuse.  He explained that abusers may slowly incorporate sexual touching into healthy or playful touching, bribe the child with gifts, or take advantage of a sleeping child who would "play[] possum."  Minor testified that the first night McDonnell abused her, she "sat there like dumbstruck."  She later testified to instances in which McDonnell would start giving her a massage or hug and then move his hands to her genital area.  Minor also testified to a pattern of trading sexual contact for "benefits" or things that she wanted.  Therefore, Dr. Bivens' testimony would have helped explain why Minor did not actively resist the abuse, as might otherwise be expected by the jury.

McDonnell further argues that Dr. Bivens' testimony "usurped the function of the jury by creating a false impression that statistical probability supported the conclusion that Minor's testimony was credible," but this argument is unconvincing.  Unlike in Batangan, Dr. Bivens' did not provide "conclusory opinions that abuse did occur and that the child victim's report of abuse [was] truthful and believable."  Id. at

558, 799 P.2d at 52 (internal quotation marks omitted).  In fact, at no point did Dr. Bivens testify to Minor's credibility or even mention Minor.  Rather, he indicated that he was not familiar with any of the facts of the case and that he had not spoken with any of the witnesses.  Morever, the jury was instructed that they were to decide how much weight to give Dr. Bivens' testimony: "Merely because such a witness has expressed an opinion does not mean . . . that you must accept this opinion.  It is up to you to decide whether to accept this testimony and how much weight to give to it."  See State v. Sawyer, 88 Hawai'i 325, 329 n.7, 966 P.2d 637, 641 n.7 (1998) ("It is presumed that the jury adhered to the court's instruction.").  Thus, Dr. Bivens' testimony did not improperly usurp the jury's function or make credibility determinations.

We therefore conclude that, in accordance with Batangan, the family court did not err in determining that Bivens' testimony regarding delayed reporting, child memory, and incomplete disclosure was relevant under HRE Rule 702.

## C. The Testimony on Incomplete Disclosure was more Probative than Prejudicial.

McDonnell next argues that, even if Dr. Bivens' testimony on incomplete disclosure was relevant, "its relevance was overwhelmingly outweighed by the danger of unfair prejudice." He argues that "Bivens' testimony about studies where victims underreported the number and severity of incidents created an

30

extreme and unwarranted danger that the jury would conclude that Minor was also probably significantly underreporting the abuse in this case." Specifically, "the jury could presume that it was statistically likely that the actual abuse that Minor experienced was more severe and more frequent than she disclosed at trial."

Even if expert testimony is relevant and admissible under HRE Rule 401, 402, and 702, it may be excluded under HRE Rule 403, which states:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

When weighing probative value versus prejudicial effect in this context, a court must consider a variety of factors, including "the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility." State v. Renon, 73 Haw. 23, 38, 828 P.2d 1266, 1273 (1992) (quotation marks and citation omitted).

"The determination of the admissibility of relevant evidence under HRE Rule 403 is eminently suited to the trial court's exercise of its discretion because it requires a 'cost-benefit calculus' and a 'delicate balance between probative value and prejudicial effect.'" State v. Balisbana, 83 Hawai'i 109, 114, 924 P.2d 1215, 1220 (1996). Thus, a trial court's

determination under HRE Rule 403 will not be overturned unless it "clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant." State v. Matias, 74 Haw. 197, 203, 840 P.2d 374, 377 (1992) (internal quotation marks, brackets, and citation omitted).

We find that the family court did not abuse its discretion in allowing Dr. Bivens' testimony regarding incomplete disclosure.

The believability and accuracy of Minor's testimony was one of the central issues at trial. As mentioned above, testimony at trial established that Minor gave incomplete disclosures to Dr. Lee. For example, Minor initially told Dr. Lee that McDonnell had touched her genital area, but had not penetrated her anus; later she told Dr. Lee that McDonnell "inserted his finger in my asshole twice." Such seemingly inconsistent reporting might normally "be attributed to inaccuracy or prevarication" of Minor's allegations. Batangan, 71 Haw. at 557, 799 P.2d at 51. Other than Dr. Bivens' testimony, there was no other testimony to explain why Minor may have failed to initially disclose the full extent of the abuse to Dr. Lee. Therefore, the probative value of Dr. Bivens' testimony regarding the initial disclosures of sexually abused children was high. See State v. Cordeiro, 99 Hawaiʻi 390, 416, 56 P.3d 692, 718 (2002) (concluding that the probative value of evidence that

32

the defendant used and sold illegal drugs was "very high" where "there was no other evidence available" to establish the defendant's motive).

Further, the potential for prejudice was not as great as McDonnell suggests. McDonnell argues that Dr. Bivens' testimony created a danger that the jury would conclude that Minor's abuse was worse than what her testimony described. However, Bivens' testimony focused on underreporting in "initial" disclosures, and did not suggest that victims would underreport at the time of trial. The State never argued that McDonnell's conduct went beyond Minor's allegations. See State v. Behrendt, 124 Hawaiʻi 90, 108 (2010) (testimony regarding uncharged child sex abuse allegations did not cause "overmastering hostility" against the defendant "particularly since the State did not argue in closing that [the complaining witness's] age at the time of the [uncharged] contacts made [the defendant's] conduct more culpable or reprehensible"). Moreover, the court specifically instructed the jury to determine whether McDonnell was guilty of the offenses as charged, and it instructed the jury that they could not find McDonnell guilty based on "mere suspicion" or "probabilities." Ultimately, the jury acquitted McDonnell on two counts of first degree sexual assault. Thus, the jury clearly focused on the evidence in the case, as relevant to each count, and did not display "overmastering hostility" against McDonnell. Thus, there was only a remote possibility that the jury would

conclude that McDonnell's conduct was worse than what Minor described and find him guilty on that basis.

As such, the family court did not "clearly exceed[] the bounds of reason" in determining that the prejudicial effect of Dr. Bivens' testimony on incomplete disclosure did not substantially outweigh its probative value.  Matias, 74 Haw. at 203, 840 P.2d at 377.  Therefore, the court did not abuse its discretion in admitting this testimony.

**D.    The Testimony on the Abuse Process was not more Prejudicial than Probative and did not Constitute Improper Profile Evidence.**

Lastly, McDonnell argues that "Bivens' testimony regarding typical child molesters, the abuse process, and his use of statistics to substantiate his claims amounted to improper profile evidence" and was substantially more prejudicial than probative.  McDonnell argues that Dr. Bivens' testimony "related to a particular class of offenders, not victims," and therefore Batangan, which addressed behaviorial norms of assault victims, does not apply here.  He also argues Dr. Bivens' use of statistics "imbued [his testimony] with an air of scientific certainty" and "planted the idea that there are scientifically identifiable traits that distinguish 'child molesters' from 'normal men.'"

As an initial matter, we must determine whether McDonnell preserved this issue for appeal.  The State asserts that this issue is waived because McDonnell objected to the

34

relevance of Dr. Bivens' testimony and "did not voice a single objection to the testimony on the grounds that it was 'profile evidence.'" McDonnell responds that he objected to this issue in both his motions in limine and at the motions in limine hearing, and that he was not required to renew his objection at trial because the family court definitively ruled that Dr. Bivens' testimony was admissible.

Generally, if a party does not raise an argument at trial, that argument is deemed waived on appeal. State v. Moses, 102 Hawaiʻi 449, 456, 77 P.3d 940, 947 (2003). Despite the State's assertion, McDonnell clearly raised the "profile evidence" argument in his second motion in limine. He argued that Dr. Bivens' testimony regarding "'profile evidence,' as exhibited in the 'abuse process' and 'grooming process'", risked profiling him a sex offender. At the hearing, McDonnell argued that testimony on "grooming" would be "highly prejudicial" and not "very probative." At the close of the hearing, the family court ruled that Dr. Bivens' testimony was admissible and stated, "I'm going to deny, [McDonnell's counsel], your motion in limine to preclude Dr. Bivens." Because the court definitively ruled on McDonnell's motion, he was not required to renew his objection regarding "profile evidence" at trial. See Kobashigawa v. Silva, 129 Hawaiʻi 313, 321, 300 P.3d 579, 587 (2013) ("[W]hen the trial court makes a definitive pretrial ruling that evidence is admissible, the party opposing the ruling need not renew its

35

objection during trial in order to preserve its claim on appeal that the evidence was erroneously admitted.").

As such, McDonnell's objection was preserved on appeal, and accordingly, we address the merits of McDonnell's argument. We find that the family court did not abuse its discretion in admitting Dr. Bivens' testimony on the abuse process.

Dr. Bivens explained that abusers may slowly incorporate sexual touching into healthy or playful touching, bribe the child with gifts, or take advantage of a sleeping child who would "play[] possum." Dr. Bivens' testimony explained the abuse process, i.e., the behavior exhibited by some offenders and the ways in which children react to that behavior. We therefore disagree with McDonnell and the Dissent that Dr. Bivens' testimony was unfairly prejudicial because it related only to the behavior of offenders, and not victims. Dissent at 39-42.

The need for this testimony was strong, since there was no other evidence available to explain Minor's behavior of not actively resisting the abuse, and indeed, seemingly acquiescing by engaging in a pattern of trading sexual contact for things she wanted. See Renon, 73 Haw. at 38, 828 P.2d at 1273 (courts must consider "the need for the evidence" and "the efficacy of alternative proof" in determining the probative value of evidence). As such, Dr. Bivens was appropriately permitted to testify regarding the dynamics of the relationship between child victims of sexual abuse and their abusers.

36

This court considered an analogous situation in State v. Clark, where the defendant was charged with attempted murder after stabbing his wife in the chest with a kitchen knife. 83 Hawaiʻi 289, 926 P.2d 194 (1996). Although the complaining witness initially told police that defendant had stabbed her, she recanted at trial and testified that she had stabbed herself.

On appeal, this court held that the trial court properly admitted expert testimony regarding the relationship between victims of domestic abuse and their abusers, including why "victims of domestic violence often recant allegations of abuse." Id. at 299, 926 P.2d at 204. We thus recognized that the expert testimony would help the jury understand the complaining witness's seemingly inexplicable decision to exculpate someone who had tried to murder her. Similarly here, Dr. Bivens' testimony would help the jury understand why Minor would barter sexual contact for favors, rather than reporting the abuse.

Indeed, the Batangan court expressly recognized the importance of such testimony, explaining that "sexual abuse of children is a particularly mysterious phenomenon, and the common experience of the jury may represent a less than adequate foundation for assessing the credibility of a young child who complains of sexual abuse." 71 Haw. at 557, 799 P.2d at 51 (internal quotation marks and citations omitted). Without Dr. Bivens' testimony, the jury would not have heard an explanation

37

for Minor's "seemingly bizarre behavior" of passively permitting the abuse and accepting gifts from McDonnell. Id. at 558, 799 P.2d at 52; see also State v. Behrendt, 124 Hawaiʻi 90, 106, 237 P.3d 1156, 1172 (2010) (emphasizing "the importance of the need factor" in HRE Rule 403 balancing). In other words, "[t]he testimony helped to explain not only how a child molester could accomplish his crimes without violence, but also why a child victim would acquiesce and be reluctant to turn against her abuser." Jones v. United States, 990 A.2d 970, 978 (D.C. 2010). Therefore, Dr. Bivens' testimony was not only relevant, but was also highly probative of Minor's credibility.

We further disagree with McDonnell that Dr. Bivens' testimony on the abuse process constituted improper profile evidence. McDonnell argues that Dr. Bivens "planted the idea" that there are "scientifically identifiable traits" that differ between child molesters and normal men and that Dr. Bivens "was an expert in distinguishing between the two groups."

As noted by the D.C. Circuit:

> In general, the "profile" label is not helpful in distinguishing admissible from inadmissible expert testimony. Instead, courts focus on the [applicable rules of evidence] and the purpose for which the evidence is offered: whether it is designed improperly to illuminate the defendant's character or propensity to engage in criminal activity, or whether instead it seeks to aid the jury in understanding a pattern of behavior beyond its ken.

United States v. Long, 328 F.3d 655, 666 (D.C. Cir. 2003).

38

Here, Dr. Bivens explicitly testified that "there is not" a typical child molester profile and that it is not possible to look at "demographic characteristics" or "personality characteristics" to determine whether someone is a child molester. Dr. Bivens did not know the specific facts of this case, and thus could not have tailored his testimony to unfairly prejudice or profile McDonnell as a child molester. Further, the State did not argue in closing that McDonnell was a child molester because he had certain characteristics or exhibited certain behaviors. Thus, McDonnell's argument that Dr. Bivens' testimony "provided the avenue for the jury to conclude that McDonnell was guilty merely because he fit the profile of a child molester" is unconvincing.

Similarly, Dr. Bivens' testimony did not constitute the use of profile evidence "as evidence of substantive guilt," as argued by the Dissent. Dissent at 44. Child sexual abuse necessarily involves a victim and an abuser, and any expert account of the relationships within which such abuse occurs will inevitably make reference to both actors. That expert testimony describes the behavior of child sex abuse offenders does not automatically render the testimony inadmissible. Rather, the trial court must apply HRE Rule 403, weighing the probative value of such testimony against the risk that it will prejudice the defendant. The Dissent points to cases from other jurisdictions as evidence of the "inherently prejudicial" nature of such

"profile evidence," but many of these cases actually counsel against a blanket prohibition on expert testimony regarding the behavior of child sexual abuse offenders.  Dissent at 20.  See, e.g., People v. Williams, 987 N.E.2d 260, 263 (N.Y. 2013) ("Here, the admission of the expert's testimony concerning abusers' behavior that was relevant to explain the accommodation syndrome was a proper exercise of discretion."); People v. Robbie, 112 Cal. Rptr. 2d 479, 488 (2001) ("We do not hold that admission of profile evidence is reversible per se."); Kurtz v. Com., 172 S.W.3d 409, 414 (Ky. 2005) ("A careful review of these circumstances, when viewed in light of the entire record, compels us to deem the error in this case prejudicial . . . .") (emphasis added).

Moreover, other jurisdictions have upheld the admission of similar expert testimony on the phenomena of child abuse as more probative than prejudicial.  See, e.g., State v. Stafford, 972 P.2d 47, 55 (Or. 1998) (upholding the admission of testimony regarding the "the cognizable behavior patterns of sex offenders as steps toward the ultimate completion of sexual abuse"); Perez v. State, 313 P.3d 862, 868 (Nev. 2013) ("As a general matter, we hold that whether expert testimony on grooming behavior is admissible in a case involving sexual conduct with a child must be determined on a case-by-case basis, considering the requirements that govern the admissibility of expert testimony."); United States v. Romero, 189 F.3d 576, 585 (7th

Cir. 1999) (allowing expert testimony on the methods of "modern child molesters"); Long, 328 F.3d at 667-69 (allowing expert testimony on characteristic patterns of "preferential sex offenders," noting that "the average layperson lacks knowledge regarding the manner in which preferential sex offenders operate"); United States v. Hayward, 359 F.3d 631, 636-37 (3d. Cir. 2004) (allowing expert testimony that "elucidated the motives and practices of an acquaintance molester").

Accordingly, the family court did not abuse its discretion in admitting Dr. Bivens' testimony on the abuse process.

Lastly, McDonnell argues that the statistics mentioned by Dr. Bivens amounted to profile evidence. Specifically, McDonnell challenges the following three statistics: "[(1) P]robably 80 percent of the time there's not physical force involved" in molestation, (2) "85 percent of the time . . . the child has a pre-existing non-sexual relationship with their molester," and (3) in two studies, "100 percent of incest offenders report molesting in their own home."

The first statistic does not constitute improper profile evidence, as it does not describe any personal characteristics of abusers that can unfairly prejudice McDonnell. The statistic explains that the vast majority of child sexual abuse does not involve violence, which--similar to the abuse

41

process testimony--helped the jury to understand the dynamics of the abuser-victim relationship.

In contrast, with regard to the second and third statistics, the risk of profiling McDonnell as an abuser was high because they implied a high statistical likelihood that abusers would exhibit certain characteristics, and those characteristics happened to fit McDonnell. The "85 percent" statistic implied that McDonnell was more likely to be an abuser because Minor was McDonnell's adopted father and she had a pre-existing non-sexual relationship with him. The "100 percent" statistic informed the jury that <u>all</u> abusers in the two studies who were related to their victims committed abuse in their homes. This presented a risk of misleading the jury into believing that, since McDonnell was both related to Minor and lived with her, McDonnell must have abused her in their home. Dr. Bivens could have testified generally that abusers are often related to their victims and that such abuse normally occurs in the home, but the use of statistics in this manner was unfairly prejudicial to McDonnell.[14] Moreover, there was no curative instruction explaining to the jury that these statistics could not be used as

---

[14] The Dissent asserts that even the use of such non-numerical terms "inherently make generalizations regarding molester behavior based on the science of statistics." Dissent at 32 n.11. We respectfully disagree. The Dissent appears to conflate testimony that could be interpreted as assigning a high numerical probability that the defendant sexually abused the complaining witness, which is inadmissible, with general testimony regarding the phenomenon of child sexual abuse, which may be allowed if it satisfies HRE Rule 403.

profile evidence.  As such, the family court erred in admitting this testimony.[15]

However, we find that the error in admitting the "85 percent" and "100 percent" statistics was harmless.  See Hawaiʻi Rules of Penal Procedure (HRPP) Rule 52(a) ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.").  Error "should not be viewed in isolation and considered purely in the abstract," but "must be examined in light of the entire proceedings and given the effect to which the whole record shows it is entitled."  State v. Sprattling, 99 Hawaiʻi 312, 320, 55 P.3d 276, 284 (2002) (internal quotation marks, citation, and brackets in original omitted).  We "must determine whether there is a reasonable possibility that the error complained of might have contributed to the conviction."  State v. Pauline, 100 Hawaiʻi 356, 378, 60 P.3d 306, 328 (2002) (internal quotation marks and citation omitted).

McDonnell was convicted under Count I for sexual assault in the first degree for inserting his finger in Minor's genital opening.  Minor testified in detail to the first instance of abuse, in which she fell asleep in McDonnell's bedroom and she

---

[15]  To mitigate the risk of prejudice to defendants in similar cases, we note generally that trial courts may wish to give a cautionary instruction to the jury following any expert testimony regarding the abuser-victim relationship.  The instruction could clarify that the testimony can only be considered for the specific purpose of understanding the dynamics of the relationship, and not to profile the defendant as an abuser.

felt his hand move into her underwear, rub her vagina, and insert a finger into it.  Minor testified that, later that day, she told Mother that McDonnell "had touched [her] that night."  Mother corroborated Minor's testimony.  Mother also testified that she confronted McDonnell, telling him "don't do that again because it's a crime" and told him to "apologize to [Minor]."  She testified that McDonnell responded "yes."  Dr. Lee further testified that he asked Minor whether her genitals were penetrated, and Minor stated that her vagina was penetrated by McDonnell's fingers.  Thus, given the strength of this testimony, there was not a reasonable possibility that the "85 percent" and "100 percent" statistics contributed to McDonnell's conviction under Count I.  Accordingly, the error in admitting the statistics was harmless.

**IV.  Conclusion**

For the foregoing reasons, the ICA correctly concluded that the family court did not abuse its discretion in admitting Dr. Bivens' testimony.  We therefore affirm the ICA's March 13, 2015 judgment on appeal.

| | |
|---|---|
| Craig W. Jerome<br>for petitioner | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| Stephen K. Tsushima<br>for respondent | /s/ Sabrina S. McKenna |

